## BANK *v.* LAYNE.

### (*Jackson.*    April 16,  1898.)

1. BILLS AND NOTES.  *Parol evidence admissible to show true relation of parties.*

    Parol evidence is admissible to show that the ostensible is not the true relation and order of liability among the parties to a note. (*Post, p. 49.*)

    Cases cited and approved: Morrison *v.* Lookout Mountain Hotel Co., 92 Tenn., 6; Bank *v.* Jefferson, 92 Tenn., 537.

2. SAME.  *Party signing as surety liable only as indorser.*

    Although a party's name may appear as surety on a note, he may show by parol that the real contract among the parties was that his liability should be that of an indorser for his co-sureties, and the contract will be accordingly enforced.  (*Post, pp. 49-53.*)

3. SAME.  *Sureties not released, when.*

    A debtor does not release sureties for his debt by dealing with a party as an indorser for them who is in fact such, although his name appears on the note as co-surety.  (*Post, p. 53.*)

---

FROM  OBION.

---

Appeal from Chancery Court of Obion County. JNO. S. COOPER, Ch.

WADDELL & WADDELL for Bank.

MOORE & WELLS and D. J. CALDWELL for Defendants.

BEARD, J.   This bill was filed to recover a balance due on a note for $2,500, made by Max Layne as principal, and J. B. Layne and W. D. Reeves as his sureties, and indorsed by J. A. Reeves. The defendants, J. B. Layne and W. D. Reeves, having already paid to the holder two-thirds of this note, resisted recovery as to the balance, or the one-third remaining due, upon the ground that the bank had improperly released their co-defendant, J. A. Reeves, from his liability as co-surety with them, while the defendant, J. A. Reeves, defended on the ground that he was not liable at all, or, if so, that his liability was secondary and as surety of the sureties. Upon the hearing, the Chancellor rendered a decree, in which it was adjudged that J. A. Reeves was primarily bound for the amount due on this note as between him and W. D. Reeves and J. B. Layne, and that these two last named were liable after the said J. A. Reeves.   W. D. and J. A. Reeves and J. B. Layne have appealed from this decree.

The facts out of which this controversy has grown, as disclosed by the record, are as follows: Upon the dissolution of a mercantile firm, of which the defendants, Max Layne and J. A. Reeves, were the members, the former became indebted to the latter in the sum of $2,500, for which amount he executed his note on February 26, 1895, to J. A. Reeves, with the defendants, W. D. Reeves and J. B. Layne, as sureties.   The note was due twelve months after date, and bore interest from its date.   The payee,

J. A. Reeves, continued the holder of this note un-
til February 28, 1896, when he negotiated a loan
upon it of $2,500 with the complainant, at the same
time making the following indorsement upon it:

"FEBRUARY 28, 1896.
"*Commercial Bank of Union City, Tenn.:*

"If you will discount this note at $2,500 as a
demand note, I will take it up at $2,500, and in-
terest, from you, on demand, with cash or a satis-
factory renewal.          (Signed) J. A. REEVES."

It will be observed that the note was upon the
verge of maturity at this time, and there is no
doubt that it was the understanding of the bank
and J. A. Reeves and Max Layne, and possibly
of the other parties, that it was to be taken up
by a renewal note. At any rate this was done; a
new note, dated March 16, 1896, for the sum of
$2,500, was executed. Instead, however, of J. A.
Reeves being the payee of this note, it was made
payable directly to the bank, and it was signed by
Max Layne, J. B. Layne, W. D. Reeves, and J.
A. Reeves, the latter affixing his name immediately
beneath the names of the other signers, and in this
form it was delivered to the bank, whose officers
accepted it as a satisfaction of its interest in the
original note, which was then delivered to J. A.
Reeves. When this note matured, Max Layne was
unable to meet it, and arrangements were made for
a second renewal.

To this end, a note prepared by Mr. Thomason, the cashier of the bank, was by him sent to Max Layne, who, after affixing his name to it, transmitted it to W. D. Reeves, at St. Louis, Missouri, for his signature, and he, having signed it, then inclosed it to Mr. Thomason in a letter, in which he stated that Max Layne had informed him that "you [Thomason] would procure the signatures of Mr. John Layne and Al [J. A.] Reeves, in connection with mine, for him." On receipt of this letter, Thomason set about securing the names of these parties on the note, so as to complete the transaction. Mr. Thomason had at least two interviews with Mr. Layne, who seemed reluctant to sign, but finally did.

A few days thereafter, this note was presented by Thomason to Mr. J. A. Reeves, and he declined to place his name on it as one of the makers, but said he was willing to write it on the back, and thus sustain the same relation to the parties as he did by his indorsement of the original note. He further stated to the officers of the bank, that if they did not accept him as indorser with the understanding that his liability was secondary to that of J. B. Layne and W. D. Reeves, they might institute suit on the note they then held. This was finally conceded to him by the representatives of the bank, when he wrote his name on the back as indorser.

The liability of J. A. Reeves on the first of these series of notes—that is, the note of February

26, 1895—was clearly secondary to that of W. D. Reeves and J. B. Layne, and, by reason of this distinct understanding with the bank's officers, it is equally clear that his liability on the present one was also a secondary one. Nor is there any doubt that, as the bank knew that W. D. Reeves and J. B. Layne were sureties on the note of March 16, 1896, if it also knew that J. A. Reeeves was their co-surety, and permitted him to change his position on the note in controversy, so that he was placed behind them as surety for Max Layne, this act, by operation of law, would release them at least from one-third of this debt, and the Chancellor's decree, holding them liable (after they have paid two-thirds of it), even secondarily, was error. Brandt on Suretyship, Sec. 383.

It becomes, therefore, important to determine his relation to that note. As has been before stated, his name was on the face of the paper, and was signed immediately underneath that of these two sureties. That he was surety for Max Layne is clear, but was he also surety for the two original sureties of Max Layne, or was he co-surety with them? The answer to this question may be determined by looking at the facts surrounding the transaction, and to parol proof as to the agreement of the parties. *Morrison* v. *Lookout Mountain Hotel Co.*, 92 Tenn., 6; *Bank* v. *Jefferson, Ib.*, 537.

It has been already stated that W. D. Reeves and J. B. Layne were the sureties for the debtor

17 P—4

on the original note.   So, when he discounted it at the bank, as between himself and the makers his liability was secondary.

The first renewal note was prepared by Thomason, the cashier in the bank, and by him was sent to Max Layne, who, having signed it, sent it to W. D. Reeves, who, after signing it, returned it to the bank, and Mr. Thomason then procured the signatures of J. B. Layne and J. A. Reeves to it.

W. D. Reeves and J. B. Layne, who were absolutely bound as sureties on the note of February 26, 1895, were then in no position to insist that J. A. Reeves should change his relation to this debt, and become jointly bound with them as sureties on the renewal.   Nor does the record exhibit any reason why J. A. Reeves should be willing to so radical a change.   The bank certainly derived no advantage from this change.   Whether as indorser or as co-surety he would be liable to it on the default of the principal.   Neither W. D. Reeves nor J. B. Layne claim to have had any communication with J. A. Reeves as to his signing the note as a co-surety with them.   What he did was at the suggestion of the bank and after the note was in an apparently complete form.   That he signed that note with the understanding on his part, as well as of the officers of the bank, that his relation to the debt and to the other parties already bound primarily, so far as he was concerned, should not be changed, we think is clear when the evidence is

Bank *v.* Layne.

carefully considered. J. A. Reeves says that when he signed the note he did not intend to extend his liability beyond that incurred by him on the original note—that of indorser, while the president of the bank says his understanding was that his liability, by his signing the note, was to be the same as on the original note, and the cashier says the same thing.

It is true J. A. Reeves says he knew Max Layne, instead of paying the original, would have to execute a renewal note, and that he "signed" it at the request and for the accommodation of Max Layne, and under the requirements of the bank, yet we think it certain that he means by this statement only that he was aware that it would be inconvenient for Max Layne to pay the original note at maturity, and that for his accommodation the witness was willing to sign or go upon a note, the proceeds of which would enable him to satisfy the demands of the bank as to the original note; and so far as the requirements of the bank were concerned, they were met when he placed his name on it so as to remain bound as on the original note. He distinctly states that he signed inadvertently at the foot of the note, but with no intention of being bound other or further than he was on the original note, and, as has already been seen, his signature was accepted there, by the officers of the bank, with the understanding that this was the limit of his liability. It is also true, Max Layne says, that, in December,

1895, he asked J. A. Reeves to become his surety on a note to the bank, to be used to raise money to pay off the note then nearing maturity, but we attach no importance to this statement, for in a popular sense, the latter would be equally the surety of the former, whether his name was on the back or front of the note.

Where the names of parties to a note are placed is to a degree immaterial, and when the relation of principal and surety is not expressed in the paper, it may be often implied from the ordinary legal relation of the parties in these various capacities. 2 Rand, Sec. 899.

That Max Layne was the principal, and that W. D. Reeves and J. B. Layne were, and intended to be, sureties for him was clearly expressed by them, in writing "surety" after their respective names. On the original note J. A. Reeves' liability was secondary to that of these two sureties; he never agreed with them, or anyone else, that he would assume any other position upon the new note, and no reason is suggested by the record why he should have done so. So, when his name is found on this new note underneath that of these two parties, who have already signed, we think it might be implied that he simply undertook as surety for the preceding parties. But when there is added to this implication the testimony of the officers of the bank, that they took the note of March 16, 1896, in that form, with the understanding that the liability of

Bank *v.* Layne.

J. A. Reeves was not affected by the change of position, and that of J. A. Reeves that his signature was placed on its face with the intention to be bound on the new note as he was on the original note, we think there is no difficulty in determining his liability to be secondary to that of the two other appellants.

Finding this as a fact, then it follows that W. D. Reeves and J. B. Layne have no occasion to complain, when the bank permitted him to place his name, as indorser, on the back of the note sued on, because the only effect of this act was to make his apparent correspond with his real relation to this debt.

It will be seen that we speak of the note of March 16 as a renewal note. It is immaterial whether it be treated as a strict renewal or not, as its execution was made necessary by Max Layne's inability to meet a note which had already matured, and was then held by the bank, and on which the liability of each party to it was then fixed.

The result is, the Chancellor was in error in decreeing that J. A. Reeves was primarily liable. A decree will be entered here adjudging that, as between W. D. Reeves, J. B. Layne, and J. A. Reeves, the two first named parties are first bound for the remainder of this note, and that J. A. Reeves is only liable after they are exhausted. The costs of the Court below will be left as they were adjudged by the Chancellor, and the costs of the

appeal will be paid by W. D. Reeves and J. B. Layne.

OPINION ON PETITION TO REHEAR.

BEARD, J. · A petition for rehearing has been presented in this cause by W. D. Reeves and J. B. Layne. Before coming to the main ground upon which this petition is based, it is proper to mention a complaint made by petitioners that we failed to dispose of the assignment of error of J. A. Reeves, upon the action of the Chancellor in sustaining the demurrer of the petitioner to so much of his cross bill as sought a recovery against them for the interest due on the note of February 26, 1895. As this demurrer was rested on the ground that the subject of this cross bill was foreign to the controversy involved in the original suit, and was sustained by the Chancellor, it is difficult to conceive how petitioners could be in any way affected by our failure to dispose of this assignment of the adversary counsel. But whether petitioners were affected or not is immaterial. The omission was not the result of inadvertence, but deliberately made, for, on an examination of the transcript, we found that the case was not before us so that the action of the Chancellor on the demurrer could be reviewed; that while the cross complainant, at the time the demurrer to this cross bill was sustained, "excepted" to the action of the Chancellor in that regard, yet he did not embrace this matter in his appeal, but limited

this to the final decree. Desiring to confine our opinion to the real issue in the case, we purposely omitted all mention of an assignment of error that was without substance.

Again, it is insisted "an inaccurate statement" in the opinion that "upon the dissolution of the mercantile firm of which Max. Layne and J. A. Reeves were the members, the former became indebted to the latter in the sum of $2,500, for which amount he executed his note on February 26, 1895, to J. A. Reeves, with the other defendants, W. D. Reeves and J. B. Layne, as sureties upon it," gave J. A. Reeves an equity at the beginning to which he was not entitled. It is difficult for us to conceive how the accuracy of our statement in this regard can be successfully challenged, in the face of this record. Max Layne, in his deposition, says: "Made said note in February, 1895. The note was given for $2,500, I agreeing to release J. A. Reeves from a co-partnership formed for the purpose of conducting a clothing . . . business, provided he would make me a loan of $2,500." This was recognized as the consideration of the note by counsel of petitioners, in their brief, in these words: "The loan of $2,500 made by J. A. Reeves to Max Layne, in February, 1895, was in consideration of Max Layne releasing him from a partnership contract." Thus, it appears that upon a dissolution of this firm, and as a condition for its dissolution, Max Layne executed and received this loan. As there was no pretense

that this note was a gratuity, or that it was otherwise than what it seemed to be, viz., a valid obligation upon the part of Max Layne and his sureties to pay the sum of $2,500 to J. A. Reeves, twelve months from its date, the writer of the opinion adopted the form of statement called in question as correctly indicating the relation of the respective parties to one another and to that obligation. The purpose was to show that this first in a series of notes leading up to the present controversy, evidenced a real debt due by Max Layne to J. A. Reeves, in which the other parties were sureties for their principal, and the statement of the manner in which the debt came about was rather by way of inducement, and was in no way essential to the main fact.

And it is true, as is insisted, that there was no moral or legal obligation resting on petitioners to renew this original note when it matured, but there was an obligation upon them to pay it, if their principal did not, and thus relieve the payee and indorser, J. A. Reeves, and the record, we think, leaves no room for doubt that it was to relieve them indirectly, and Max Layne directly, from the immediate discharge of this duty, and to enable the latter to get still further indulgence, that the dealing with the bank was resorted to, resulting in the execution of the new note of March 16, 1896.

It may be true, as stated, that the plan of getting the money from the bank was discussed, and,

perhaps, agreed upon, by Max Layne and J. A. Reeves, before it was mentioned to the other parties, but the fact remains that the loan thus contemplated was to be made for the purpose of lifting the strain of immediate payment of a binding obligation of Max Layne, J. B. Layne, and W. D. Reeves, held by J. A. Reeves, which was rapidly maturing, and while the arrangement resulted in placing $2,500 of that note in the pocket of the holder of the debt, it gave further indulgence to the makers, who, but for this arrangement, would have been obliged to take it up at maturity.

What motive J. A. Reeves could have in agreeing to an arrangement out of which he received simply the principal, lacking the interest, of his note, and assumed the position of guarantor and indorser upon it, save that of a friendly disposition to these parties, we cannot conceive, as the record does not disclose. It does appear, however, that all these makers, at the time the note of February, 1895, fell due, were solvent, and this fact furnishes an explanation of J. A. Reeves' willingness to make the indorsement he did when he turned it over to the bank, and goes far to repel any inference, that, while thus securing indulgence to them, he intended, or that any of these parties expected him, to change his relation to the debt or the parties to it, on the execution of the renewal note. Why should he do so? Max Layne, J. B. Layne, and W. D. Reeves were absolutely bound to him before the transfer of the original

note, and they stood between him and payment after its transfer.    Their only alternatives at its maturity were to pay or renew, and Max Layne, the principal, for his own relief directly and that of his sureties indirectly, preferred the latter alternative— a renewal.

Now, under these circumstances, we can think of no motive to induce J. A. Reeves, intelligently and of design, to make the radical change in his relations to this continuing debt and these parties, as it is insisted he did, nor of any right on their part either to expect or demand such a change.    It is against common experience and the ordinary and reasonable course of business transactions that this should have been done, and, therefore, his co-defendants, who insist that he did so, must be prepared to show the fact, and to this we do not think they make an approach, save in the single fact that he put his name on the face, rather than on its back.    The force of this fact, however, is greatly weakened, if not entirely destroyed, when the record as a whole is examined.    This was the view entertained by us, and the one we undertook to express in our original opinion.    The case, by reason of the earnestness and ability of the several counsel engaged, as well as of its peculiar facts developing a singular controversy, was the subject of careful examination, followed by a most extensive consultation, before any conclusion was reached.    Since the petition for rehearing was filed, fearing lest injustice might have

been done petitioners, the record has been re-examined, with a desire to find if an error had crept into our decree, and, if so, with a purpose to correct it. The result is that we are satisfied upon this phase of the controversy, and, without going again over the facts, that the conclusion announced by us was the one most justified by the case when taken in all its facts.

But it is urged that, without regard to former equities, and without regard to whether J. A. Reeves was an indorser or a security, these parties had the right to say to the bank: "We sign this note on the condition that J. A. Reeves is to sign as a co-surety for Max Layne." We agree that this is a sound proposition, and that if the record warranted it, and the bank had violated this condition thus imposed, it could not recover at all against these parties. But we do not think the testimony warrants it. It is true that J. B. Layne and. W. D. Reeves now swear that they would not have signed this except save on that condition, but did they impose it on the bank?

The only communication that W. D. Reeves had with the bank was by the letter of June 19, 1896, made an exhibit to Mr. Thomason's deposition. In that letter he incloses the note in controversy, which he had received from Max Layne, and, having signed it, he forwarded it at his request. The following clause in the letter is the only one bearing on this point, viz., "and said [that is, Max Layne] that

you would procure the signatures of Mr. John
Layne and Al Reeves, in connection with mine, for
him.'' It will be observed that it is suggested that
the note is forwarded to Mr. Thomason at the re-
quest of Max Layne, who desired that Mr. Thomason
should act for him (Layne) in getting these ''signa-
tures.'' This falls far short of imposing the ''con-
dition'' now urged, and especially a condition that
J. A. (or Al) Reeves should be required to go on
it as co-surety. It was his ''signature'' that was
required, and, although it was to be ''in connec-
tion'' with the writer's, yet this ''connection'' was
as literally answered when it was placed on the back,
as on the face of the note. As to J. B. Layne,
he does swear positively, on direct examination,
that Mr. Thomason told him that J. A. Reeves
had agreed ''to sign'' this note, and again, that
he refused to sign it when it was first presented
to him, because J. A. Reeves had not ''signed it.''
On cross-examination, he confesses, however, that he
did not know whether any name was on this note
when presented to him to sign, and then, in an-
swer to still another question, says he ''thinks'' he
signed the note before J. A. Reeves. Contrast this
with the undisputed fact, that, when presented to
him, the note had already been signed by Max
Layne and W. D. Reeves, and with his swearing in
his direct examination, that he refused to sign it
because J. A. Reeves' name was not on it, and it
will be seen how weak and unsatisfactory his testi-

Bank *v.* Layne.

mony is. Other contradictions are found in his depositions that it is unnecessary to point out. In addition, Mr. Thomason, on this point, distinctly contradicts him.

Without occupying more time, we are satisfied on this record, first, that the note sued on is the last of a series of notes, the first of which represented a debt to J. A. Reeves, for which these petitioners were bound; second, that the note executed to the bank on March 16, 1896, was, in effect, a renewal, and that without either the demand of Max Layne and these petitioners, or their knowledge, and inadvertently upon the part of J. A. Reeves, he placed his name on the face of this note; third, that this was done without any purpose to change his relation to the debt or the parties, and that this was so understood by the officers of the bank; and, fourth, that the present note was not signed by J. B. Layne and W. D. Reeves upon condition that J. A. Reeves should attach his name as a co-surety with them.

The result is, the petition is dismissed.